1
2
3
4
5

Daniel Cohen, AZ Bar # 032552
CONSUMER ATTORNEYS
68-29 Main Street
Flushing, NY 11367
Telephone: (718) 770-7940
(718) 715-1750 (fax)
E: dcohen@consumerattorneys.com

6    *Attorneys for Plaintiff Laurie Baird*

7

8    **IN THE UNITED STATES DISTRICT COURT**
9    **FOR THE DISTRICT OF ARIZONA**
     **TUCSON DIVISION**

10

11   Laurie Baird,                              **Case No.:**

12                        Plaintiff,

13           v.                                 **COMPLAINT AND JURY TRIAL**
                                                **DEMAND**
14   Experian Information Solutions, Inc.,
     Equifax Information Services, LLC, Trans
15   Union LLC, National Credit Systems, Inc.,

16                        Defendants.

17

18                                    **COMPLAINT**

19          Laurie Baird ("Plaintiff"), by and through the undersigned counsel, brings this action

20   on an individual basis, against Equifax Information Services, LLC ("Defendant Equifax"

21   or "Equifax"); Experian Information Solutions, Inc. ("Defendant Experian" or "Experian");

22   Trans Union, LLC ("Defendant Trans Union" or "Trans Union") (collectively, the "Credit
23
     Bureau Defendants"); and National Credit Systems, Inc. ("Defendant National" or
24
25   "National"); (all defendants collectively, "Defendants"), and states as follows:

26

27

28
                                            1

## INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from

the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

10.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims stem from the Credit Bureau Defendants' egregiously inaccurate credit reporting, which misrepresented to Plaintiff's prospective creditors that Plaintiff had an outstanding rental debt owed to National, with Cortland Sun River Apartments identified as the original creditor.

12.    Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed

was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.    Plaintiff also brings a claim against Defendant National for failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b).

14.    Plaintiff further brings claims against Defendant National for violations of the Fair Debt Collection Practices Act, specifically §§ 1692e(2)(A), 1692e(10), and 1692f(1), for misrepresenting the character, amount, and legal status of a debt, using false representations to collect amounts not legally owed, and attempting to collect amounts not permitted by law.

15.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

16.    As part of this action, Plaintiff seeks actual damages, statutory damages, costs and attorneys' fees from Defendant National for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*., as described herein.

## **PARTIES**

17.    Laurie Baird ("Plaintiff") is a natural person residing in Tucson, Arizona, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

18.    Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550

Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Arizona, including within this District. Equifax can be served through its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

19.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of Arizona, including within this District. Experian can be served through its registered agent, C T Corporation System, at 330 North Brand Boulevard, Glendale, California 91203.

21.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

22.    Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of Arizona, including within this District. Trans Union can be served through its registered agent,

Illinois Corporation Service Company, at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

23.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

24.     Defendant National Credit Systems, Inc. ("Defendant National" or "National") is a debt collector with its principal place of business located a 1775 The Exchange SE, Suite 300, Atlanta, GA 30339 and is authorized to do business in the State of Arizona, including within this District. National can be served through its registered agent, C T Corporation System, at 289 S Culver St, Lawrenceville, GA, 30046-4805.

25.     Defendant National regularly collects or attempts to collect debts owed or due or asserted to be owed or due another, and is therefore a "debt collector" within the meaning of the FDCPA, as defined at 15 U.S.C. §1692a(6). Defendant National regularly uses the telephone and mail to engage in the business of collecting debts and/or alleged debts from consumers in several states, including New York.

26.     Defendant National is a debt collector and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

### FACTS
#### Summary of the Fair Credit Reporting Act

29.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

30.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

31.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

32.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in

consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

33.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Factual Background**

34.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

35.     The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

36.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

37.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

38.     The Credit Bureau Defendants' consumer reports generally contain the following information:

(a)     Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)     Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)     Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(d)     Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

39.     The Credit Bureau Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

40.     The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

41.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported

debt, payment history, and date of delinquencies contained in the Credit Bureau Defendants' consumer reports.

42. The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

43. FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

44. The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

45. The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

46. DTI compares the total amount a consumer owes to the total amount a consumer earns.

47. The higher the amount of reported debt that a consumer has, appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

48. The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

49.    The Credit Bureau Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

50.    Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

51.    Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures.  Specifically, the Credit Bureau Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

52.    The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

**Plaintiff's Residence at Sun River Apartments**

53.    On or around February 28, 2020, Plaintiff entered into a lease agreement with Cortland Sun River Apartments and took occupancy of the premises.

54.    At the time of move-in, Plaintiff paid a $500.00 security deposit, a customary practice in the rental industry designed to cover potential property damage or any outstanding financial obligations at the end of the tenancy term.

55.     In or around February 2023, Cortland Sun River Apartments required Plaintiff to vacate her apartment before the lease's scheduled expiration on March 30, 2023, to facilitate renovations to the complex, including her unit.

56.     Under pressure and with no viable alternatives, Plaintiff vacated her apartment on or about March 3, 2023, prior to the lease's expiration date of March 30, 2023.

57.     Plaintiff's final account statement from Sun River Apartments explicitly reflected the lease expiration date of March 30, 2023, and the forced move-out date of March 3, 2023.

**Defendants Report that Plaintiff is Delinquent on One or More Payment Obligations**

58.     Shortly thereafter, Plaintiff discovered that she had been reported as owing a rent-related debt to Sun River Apartments, which had been transferred to and was being pursued by Defendant National. This revelation deeply distressed Plaintiff, as she placed significant importance on maintaining her credit health and was gravely concerned about the potential negative impact on her credit score and overall creditworthiness.

59.     Upon further investigation into the inaccurate outstanding balance claimed by Defendant National, Plaintiff discovered that she was being charged a $2,410.00 lease termination fee, despite the fact that she had not voluntarily terminated the lease but was instead compelled to vacate the premises prior to the lease expiration date.

60.     The "Early Termination" clause of Plaintiff's lease states:

"Resident may terminate this Agreement early if Resident has resided in the premises for at least five (5) months and provides a written request for early termination with a termination date [at] least 30 days after request. If [at] least 60 months after physically occupying the premises, and if which falls on the last day of a month, Resident must pay rent and other charges through the date of move-out, repay any concessions received and pay an Early Termination Fee equivalent to one month of

- 13 -

rent. All such amounts must be paid before vacating the premises. Therefore, Resident shall be released from the obligations of this Agreement except regarding damages to the premises. All such amounts must be paid before vacating the premises."

61.    This clause specifies that such a fee is only implicated if the tenant voluntarily terminates the lease by providing written notice in addition to meeting other specific conditions.

62.    But Plaintiff neither voluntarily terminated the lease nor provided written notice to that effect. Rather, she was forced to leave the premises at the landlord's demand for reasons entirely outside her control. The imposition of the early termination fee is therefore inconsistent with the plain language of the lease provision, which makes clear that the fee is contingent upon a tenant-initiated termination of the lease. Here, Plaintiff's departure did not meet the requirements for triggering the fee, as it was necessitated by the landlord's unilateral decision to renovate the premises.

63.    Plaintiff therefore was and is not liable for the $2,410.00 payment that Defendant National represented—and continues to represent—Plaintiff owes.

64.    Additionally, the final account statement reflected a balance of $429.56 as of the move-out date, alongside a claim that only $20.00 of Plaintiff's security deposit remained—an amount insufficient to cover the reported balance. However, as documented in the move-in statement, Plaintiff had paid a $500.00 security deposit, which she never received back and which would have more than covered the $429.56 balance at move-out.

65.    The initially tendered $500.00 deposit should have been applied to the $429.56 balance, as pursuant to the lease agreement, the security deposit was there precisely to secure Plaintiff's obligations under the lease agreement.

- 14 -

66.    Plaintiff therefore was and is not liable for the $429.56 payment that Defendant National represented—and continues to represent—Plaintiff owes.

67.    Cumulatively, Plaintiff was reported as owing $2,819.56 at the time of move-out, an amount that was subsequently transferred to Defendant National for collection.

68.    Defendant National reported to the Credit Bureau Defendants that Plaintiff owed on the inaccurate collection account a balance of 2,819.56.

69.    The Credit Bureau Defendants reported on Plaintiff's credit files and reports that she owed an inaccurate balance of $2,819.56 on the collection account with Defendant National.

70.    Plaintiff was both confused and distressed upon learning this information, as she knew the reported amount was inaccurate and did not reflect any legitimate debt owed.

**Plaintiff's First Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

71.    Shocked, surprised, and embarrassed by the Credit Bureau Defendants' inaccurate reporting, Plaintiff disputed the collection entry associated with Cortland Sun River Apartments with Defendants Equifax and Experian in or around October 2023.

72.    Plaintiff specifically mailed a dispute letter to Defendant Experian on or about October 12, 2023, and another to Defendant Equifax on or about October 30, 2023.

73.    On or about April 5, 2024, Plaintiff additionally submitted a dispute to Defendant TransUnion, challenging the collection entry associated with Cortland Sun River Apartments.

74.    In these disputes, Plaintiff explained that she had paid a $500.00 security deposit upon move-in, on or around February 28, 2023, that should have more-than covered

any purported outstanding amounts owed at her move-out date (represented to be $429.56). She was subsequently forced to vacate her apartment due to renovations prior to the termination of her lease agreement. Despite being compelled to move out against her will, Cortland Sun River Apartments erroneously charged Plaintiff a $2,410.00 early termination fee. This charge was clearly improper, as Plaintiff did not terminate the lease but was instead forced out due to renovations—a fact corroborated by the final account move-out statement issued by Cortland Sun River Apartments.

75.    To substantiate the validity of her dispute allegations, Plaintiff provided supporting documentation, including her State Identification card and statements and ledgers from Cortland Sun River Apartments. These documents demonstrated that she was forced to vacate due to renovations and had initially paid a $500.00 security deposit at the start of her tenancy, but how despite this fact, Cortland Sun River Apartments proceeded to represent that only $20.00 was in deposit.

76.    Plaintiff requested that Defendants Equifax, Experian, and TransUnion reinvestigate the disputed information, correct the inaccuracies in their reporting, and provide her with updated copies of her credit report reflecting the corrections.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

77.    Upon information and belief, on or about November 4, 2023, Defendant Equifax received Plaintiff's dispute tendered on or about October 30, 2023.

78.    Upon information and belief, Defendant Equifax sent Defendant National an automated credit dispute verification ("ACDV") pursuant to Plaintiff's October 30, 2023, dispute to Defendant Equifax.

79.    Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

80.    Specifically, Defendant Equifax failed to provide Plaintiff with a dispute response within the required thirty (30) days from the date it received notice of the dispute, in violation of 15 U.S.C. § 1681i(a)(1)(A).

81.    If Defendant Equifax failed to forward notice of Plaintiff's dispute to Defendant National, then Defendant Equifax violated its obligation pursuant to 15 U.S.C. § 1681i(a)(2)(A)-(B) of providing notice of Plaintiff's dispute within five-days of reception of Plaintiff's dispute with all of the accompanying documents and information Plaintiff provided in her dispute submission.

82.    On or about February 23, 2024, well beyond the 30-day period mandated by 15 U.S.C. § 1681i(a)(1)(A), Defendant Equifax sent a letter to Plaintiff stating that her dispute had been reinvestigated and verified as accurate. This response was not only untimely but also contradicted the substantial documentation Plaintiff had provided to support her claims.

83.    Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute submitted on or about October 30, 2023. Despite the dispute and supporting evidence provided by Plaintiff, Defendant Equifax has continued to report the inaccurate debt collection notation associated with the Cortland Sun River Apartments account in Plaintiff's credit file and reports.

84.    Defendant Equifax failed to correct or delete the subject collection notation appearing in Plaintiff's credit file.

85.    Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered on or about October 30, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Experian's Unreasonable Dispute Reinvestigation**

86.    Upon information and belief, on or about October 16, 2023, Defendant Experian received Plaintiff's dispute tendered on or about October 12, 2023.

87.    Upon information and belief, Defendant Experian sent Defendant National an automated credit dispute verification ("ACDV") pursuant to Plaintiff's dispute tendered on or about October 12, 2023.

88.    Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

89.    Specifically, Plaintiff did not receive a dispute response from Defendant Experian within the requisite thirty (30) day timeframe from the date on which Defendant Experian received notice of the dispute, pursuant to 15 U.S.C. § 1681i(a)(1)(A).

90.    If Defendant Experian failed to forward notice of Plaintiff's dispute to Defendant National, then Defendant Experian violated its obligation pursuant to 15 U.S.C. § 1681i(a)(2)(A)-(B) of providing notice of Plaintiff's dispute within five-days of reception of Plaintiff's dispute with all of the accompanying documents and information Plaintiff provided in her dispute submission.

91.    Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered on or about October 12, 2023, and

has continued to include the inaccurate debt collection notation relating to the Cortland Sun River Apartments account in Plaintiff's credit file and reports.

92.    Defendant Experian failed to correct or delete the debt collection notation relating to the appearing in Plaintiff's credit file.

93.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered on or about October 12, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

94.    Upon information and belief, on or about April 15, 2024, Defendant Trans Union received Plaintiff's dispute tendered on or about April 5, 2024.

95.    Upon information and belief, Defendant Trans Union sent Defendant National an automated credit dispute verification ("ACDV") pursuant to Plaintiff's dispute tendered on or about April 5, 2024.

96.    If Defendant Trans Union failed to forward notice of Plaintiff's dispute to Defendant National, then Defendant Trans Union violated its obligation pursuant to 15 U.S.C. § 1681i(a)(2)(A)-(B) of providing notice of Plaintiff's dispute within five-days of reception of Plaintiff's dispute with all of the accompanying documents and information Plaintiff provided in her dispute submission.

97.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

98.    Specifically, Plaintiff did not receive a dispute response from Defendant Trans Union within the requisite thirty (30) day timeframe from the date on which Defendant Trans Union received notice of the dispute, pursuant to 15 U.S.C. § 1681i(a)(1)(A).

99.    Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered on or about April 5, 2024, as Defendant Trans Union continued to include the inaccurate debt collection notation relating to the Cortland Sun River Apartments account in Plaintiff's credit files and reports.

100.    Thereafter, Defendant Trans Union failed to correct or delete the inaccurate debt collection notation relating to the Cortland Sun River Apartments account appearing in Plaintiff's credit file and reports.

101.    Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered April 5, 2024, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

102.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

103.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting

agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

104.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

105.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

106.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

107.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

108.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

109.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

110.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

111.    The data furnishers, like Defendant National, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account

and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

112. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

### Defendant National's Unreasonable Dispute Reinvestigation

113. Upon information and belief, on or about November 4, 2023, Defendant National received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

114. Upon information and belief, Defendant National failed to review all relevant information provided by Defendant Equifax regarding Plaintiff's dispute tendered on or about October 30, 2023.

115. Upon information and belief, Defendant National verified the disputed information as accurate to Defendant Equifax on or about December 4, 2023.

116. Upon information and belief, on or about October 16, 2023, Defendant National received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

117.    Upon information and belief, Defendant National failed to review all relevant information provided by Defendant Experian regarding Plaintiff's dispute tendered on or about October 12, 2023.

118.    Upon information and belief, on or about November 16, 2023, Defendant National verified the disputed information as accurate to Defendant Experian.

119.    Upon information and belief, on or about April 15, 2024, Defendant National received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

120.    Upon information and belief, Defendant National failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's dispute tendered on or about April 5, 2024.

121.    Upon information and belief, on or about May 15, 2024, Defendant National verified the disputed information as accurate to Defendant Trans Union.

122.    Defendant National violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

123.    Plaintiff reasonably believes that Defendant National continued to furnish data to the national credit bureaus inaccurately suggesting that Plaintiff had a payment obligation owed to Defendant National relating to her Cortland Sun River Apartments rental.

124.    Plaintiff reasonably believes that the Credit Bureau Defendants continued to publish that Plaintiff had a payment obligation owed to Defendant National relating to her Cortland Sun River Apartments account.

125.    As a result of the inaccurate sum associated with the debt collection notation, and despite Plaintiff's comprehensive disputes submitted, the Defendants made it practically impossible for Plaintiff to continue to obtain credit.

126.    Specifically, in late March 2024, Plaintiff found herself in need of credit to address unforeseen expenses for which she lacked sufficient funds. To meet this financial need, Plaintiff submitted a credit application to Citibank for a Custom Cash Mastercard on or about March 29, 2024.

127.    On or about March 29, 2024, Plaintiff's credit application was denied due to the information furnished by Defendant Experian to Citibank. This information included the inaccurate $2,819.00 debt collection notation associated with the Cortland Sun River Apartments rental account. Upon information and belief, the provision of this information substantially contributed to Plaintiff's denial.

128.    Additionally, in or around late October 2024, Plaintiff's vehicle, which had experienced multiple breakdowns, was declared beyond repair by her dealership. Due to her urgent need for reliable transportation—particularly because she must be at work by 6:00 AM and has no access to public transit at that hour—Plaintiff was compelled to purchase a used 2019 Lexus NX300 through Hughes Federal Credit Union. To secure the vehicle, Plaintiff had to accept a 10% interest rate, which, upon information and belief, was

caused in whole or in part by the Defendants' inaccurate maintenance and reporting of the $2,819.00 debt related to Plaintiff's Cortland Sun River Apartments rental account.

129.    Plaintiff further submitted two loan applications, one with Wells Fargo Auto and one with Vantage West Credit Union in or around late October 2024, desperate to secure funding for a vehicle that her daily life necessitated.

130.    In or around November 2024, Plaintiff received an adverse action letter from Wells Fargo Auto dated to November 9, 2024, stating that she was denied the credit application on the terms she requested because of an insufficient credit score, serious delinquencies, and public record of collection filed, among other things. Upon information and belief, Plaintiff's credit application to Wells Fargo Auto was denied in whole or in part by the Defendants' inaccurate maintenance and reporting of the $2,819.00 debt related to Plaintiff's Cortland Sun River Apartments rental account.

131.    In or around November 2024, Plaintiff further received an adverse action notice from Vantage West Credit Union dated to November 12, 2024, denying her auto loan request due to delinquent past or present obligations with others and collection actions or judgements.

132.    Upon information and belief, Plaintiff's credit application to Wells Fargo Auto was denied in whole or in part by the Defendants' inaccurate maintenance and reporting of the $2,819.00 debt related to Plaintiff's Cortland Sun River Apartments rental account.

133.    Furthermore, due to an inaccurate Defendant national's inaccurate debt collection notation relating to Plaintiff's Sun River Apartments tenancy, Plaintiff's current

landlord required an additional 1.5 months' rent upfront before approving the lease agreement—demonstrating further financial damages caused by Defendants' incorrect reporting.

134.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

135.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

136.    As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

137.    The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

138.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her credit rating; detriment to her credit rating; substantial financial losses including but not limited to the ones delineated above; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

139.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

140.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

141.    On numerous occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

- 27 -

142.   Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

143.   Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

144.   Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

145.   Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

146.   As a result of Defendants' Equifax, Experian, and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her credit rating; detriment to her credit rating; substantial financial losses including but not limited to the ones delineated above; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

147.   Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive

damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

148.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

149.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

150.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposed a 30-day time limit for the completion of such an investigation.  *Id.*

151.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

152.    On at least one occasion within the past two years, Plaintiff disputed the inaccurate information with Defendants Equifax, Experian, and TransUnion, requesting that they correct or delete a specific item in her credit file. This item, namely the report of an

inaccurate $2,819.00 debt collection notation associated with the Cortland Sun River Apartments rental account, is patently inaccurate, misleading, and highly damaging to Plaintiff.

153. In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

154. In response to Plaintiff's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

155. In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

156. The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

157. As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her credit rating; detriment to her credit rating; substantial financial losses including but not limited to the ones delineated above; the expenditure of time and money disputing and

trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

158.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

159.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681s-2(b)**
**Failure to Conduct an Investigation of the Disputed Information and Review all
Relevant Information Provided by the Consumer
(Only Claim for Relief Against Defendant National)**

160.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

161.    Defendant National furnished the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

162.    Defendant National violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's disputes, or otherwise by failing to fully and properly investigate Plaintiff's disputes, including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent

the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

163.    As a result of Defendant National's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her credit rating; detriment to her credit rating; substantial financial losses including but not limited to the ones delineated above; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

164.    Defendant National's conduct, action, and inaction were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant National was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

165.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant National in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**
**FAIR DEBT COLLECTION PRACTICES ACT**
**Misrepresenting The Character, Amount, Or Legal Status of Any Debt**
**15 U.S.C. § 1692e(2)(A)**
**(Against Defendant National Only)**

166.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

167.    The FDCPA is a comprehensive regulatory scheme that Congress enacted to eliminate abusive, deceptive, and unfair debt collection practices by debt collectors and to promote consistent state action to protect consumers against debt collection abuses.  15 U.S.C. §§ 1692(a), (e).

168.    When Congress enacted the FDCPA in 1977, Congress had found that abusive debt collection practices harmed consumers by, among other things, increasing personal bankruptcy, marital instability, loss of employment, and invasion of privacy.

169.    Defendant National falsely represented the character, amount, and legal status of Plaintiff's debt to Equifax, Experian, and TransUnion by reporting and verifying as accurate a purported debt of $2,819.56, comprised of an improper $2,410.00 lease termination fee that Plaintiff did not actually owe as she was forced to vacate her apartment due to renovations rather than voluntarily terminating her lease, and a $429.56 balance that should have been covered by Plaintiff's $500.00 security deposit that was never returned to her.

170.    Upon information and belief, Defendant National utilizes these false, deceptive, misleading, unfair, and unconscionable tactics as a matter of course when attempting to collect debts from consumers such as Plaintiff, despite the fact that Defendant National knew or initially should have known that Plaintiff had been forced to vacate her apartment before the lease expiration date due to the landlord's renovations, and therefore could not be liable for an early termination fee under the express terms of

the lease agreement, and that her $500.00 security deposit should have been applied to cover any remaining balance at move-out.

171.    Defendant National's conduct is intentional and Defendant National did not maintain procedures reasonably adapted to avoid such conduct.

172.    Defendant National violated § 1692e(2)(A) of the FDCPA by misrepresenting the legal status of the alleged debt to the Credit Bureau Defendants that Defendant National attempted to collect from Plaintiff. Defendant National's misrepresentations were made knowingly and with the intent to deceive and coerce the least sophisticated consumer.

173.    Defendant National's acts as described above were done intentionally with the purpose of coercing Plaintiff to pay the alleged debt.

174.    Defendant National's debt collection actions, including reporting the invalid debt associated with Plaintiff's Sun River Apartments Account to the Credit Bureau Defendants, and upon information and belief, communicating with Plaintiff about the debt to collect on same, used false, deceptive, or misleading representations or means in connection with the collection of a debt.

175.    As a result of Defendant National's actions and/or inactions, Plaintiff suffered injuries in fact, including but not limited to, the above-referenced economic damages, damage to her credit rating, credit standing, credit worthiness, emotional distress, anxiety, embarrassment, frustration, loss of appetite, and lost sleep. Plaintiff is entitled to recover actual damages, statutory damages, declaratory relief, injunctive relief, and attorneys' fees and costs.

1
2
3
4

**COUNT V**
**FAIR DEBT COLLECTION PRACTICES ACT**
**Use Of Any False Representation Or Deceptive Means To Collect Or Attempt To**
**Collect Any Debt**
**15 U.S.C. § 1692e(10)**
**(Against Defendant National Only)**

5
6

176.    Plaintiff incorporates by reference all of the above paragraphs of this

7

Complaint as though fully stated herein.

8
9
10

177.    Defendant National further violated the FDCPA by making false and

deceptive representations that Plaintiff owed a debt that she did not legally owe to the

Credit Bureau Defendants repeatedly, as discussed above.

11
12
13
14
15
16
17
18

178.    The alleged debt was in fact not legally owed because Plaintiff was forced

to vacate her apartment prior to the lease's expiration due to the landlord's renovations,

making the $2,410.00 early termination fee improper under the lease terms which only

permitted such fees for voluntary early termination, and because her initial $500.00

security deposit should have been applied to cover the claimed $429.56 move-out balance,

making the total claimed debt of $2,819.56 neither valid nor collectible.

19
20
21

179.    Defendant National's representations were made knowingly and with the

intent to deceive and coerce the least sophisticated consumer in order to induce payments

for alleged debt that is uncollectable as a matter of law.

22
23
24
25

180.    Defendant National's debt collection actions constituted false, deceptive, or

misleading representations or means used by Defendant National in connection with the

collection of a debt.

26
27
28

181.    As a result of Defendant National's actions and/or inactions, Plaintiff

suffered injuries in fact, including but not limited to, the above-referenced economic

damages, damage to her credit rating, credit standing, credit worthiness, emotional distress, anxiety, embarrassment, frustration, loss of appetite, and lost sleep. Plaintiff is entitled to recover actual damages, statutory damages, declaratory relief, injunctive relief, and attorneys' fees and costs.

<u>COUNT VI</u>
<strong>FAIR DEBT COLLECTION PRACTICES ACT</strong>
<strong>Collection Of A Debt Amount Unauthorized by Explicit Law or Agreement</strong>
<strong>15 U.S.C. § 1692f(1)</strong>
<strong>(Against Defendant National Only)</strong>

182.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

183.    Defendant National further violated the FDCPA by using unfair or unconscionable means to collect a debt.

184.    Defendant National's unfair and unconscionable means include, without limitation:

   a.   Attempting to collect an alleged debt from Plaintiff consisting of a lease termination fee of $2,410.00 for which Plaintiff bore no legal obligation, as the fee was only applicable under the lease terms for voluntary early termination whereas Plaintiff's departure was compelled by the landlord's renovation demands, and a purported balance of $429.56 that should have been fully satisfied by Plaintiff's unreturned $500.00 security deposit, thereby rendering all such invalid debts uncollectible pursuant to 15 U.S.C. § 1692f(1);

b.  Attempting to coerce, pressure and/or deceive Plaintiff into paying money that she did not in fact owe.

185.    Defendant National's debt collection actions and/or inactions were false, deceptive, or misleading representations or means used in connection with the collection of an alleged debt.

186.    As a result of Defendant National's actions and/or inactions, Plaintiff suffered injuries in fact, including but not limited to, the above-referenced economic damages, damage to her credit rating, credit standing, credit worthiness, emotional distress, anxiety, embarrassment, frustration, loss of appetite, and lost sleep. Plaintiff is entitled to recover actual damages, statutory damages, declaratory relief, injunctive relief, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendants negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Determining that Defendant National Credit Systems, Inc. as a debt collector, violated the FDCPA;

v.    Awarding Plaintiff actual and statutory damages as provided by the FDCPA;

vi.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FDCPA; and,

vii.     Granting further relief, in law or equity, as this Court may deem appropriate and just.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: January 24, 2025

*/s/ Daniel Cohen*
Daniel Cohen, AZ Bar # 032552
CONSUMER ATTORNEYS
68-29 Main Street
Flushing, NY 11367
Telephone: (718) 770-7940
(718) 715-1750 (fax)
E: dcohen@consumerattorneys.com


*Attorneys for Plaintiff*
*Laurie Baird*
